1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

BENJAMIN ALVARADO,         )
                           )
        Plaintiff,         )
                           ) CASE NUMBER:
VS.                        ) 8:14-cv-00447-VMC-TGW
                           )
CREDIT PROTECTION          )
ASSOCIATION, L.P.,         )
                           )
        Defendants.        )

------------------------------------

VIDEOCONFERENCE DEPOSITION OF

DIANE EVANS, FED.R.CIV.P.30(b)(6)

OCTOBER 22, 2014

------------------------------------

   VIDEOCONFERENCE DEPOSITION OF DIANE EVANS,

FED.R.CIV.P.30(B)(6), produced as a witness at the

instance of the Plaintiff, and duly sworn, was taken in

the above-styled and -numbered cause on

October 22, 2014, from 12:01 p.m. to 1:45 p.m., before

Lindsy R. Conrad, CSR in and for the State of Texas,

reported by machine shorthand, at the offices of Collins

Realtime Reporting, 1700 Pacific Avenue, Dallas, Texas,

pursuant to the Federal Rules of Civil Procedure.

## Page 2

**APPEARANCES**

FOR THE PLAINTIFF:
Mr. James S. Giardina (Via Videoconference)
Ms. Kimberly Wochholz (Via Videoconference)
CONSUMER RIGHTS LAW GROUP, PLLC
3104 West Waters Avenue
Suite 200
Tampa, Florida 33614
Phone: 813-413-5710  Fax: 813-889-7512

FOR THE DEFENDANTS:
Mr. John Philip Gaset (Via Videoconference)
HINSHAW & CULBERTSON, LLP
Suite 500
100 South Ashley Drive
Tampa, Florida 33602
Phone: 813-868-8891  Fax: 813-276-1662
E-mail: jgaset@hinshawlaw.com

## Page 3

### INDEX

| | PAGE |
|---|---|
| Appearances | 2 |
| DIANE EVANS, FED.R.CIV.P.30(b)(6) | |
|    Examination by Mr. Giardina | 4 |
|    Examination by Ms. Wochholz | 65 |
| Reporter's Certificate | 67 |

### EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Bright House Networks Work order/Receipt | 52 |
| 4 | Debtor account lookup, account history, etc. | 9 |
| 6 | Complaint, Jury Demand | 42 |

## Page 4

1  (All exhibits premarked)
2              DIANE EVANS,
3  having been first duly sworn, testified as follows:
4              EXAMINATION
5  BY MR. GIARDINA:
6      Q. Could you please state your name for the
7  record.
8      A. Diane E. Evans.
9      Q. Ms. Evans, have you ever had your deposition
10 taken before?
11     A. Yes.
12     Q. Okay. So you know that I'm going to ask you
13 some questions and you'll -- you know, you're sort of
14 expected to answer them and to tell the truth to all the
15 questions that I'm asking you today?
16     A. Yes.
17     Q. And are you -- is there any reason that you
18 wouldn't be able to answer truthfully?
19     A. No.
20     Q. Are you under the influence -- and I'm sorry, I
21 have to ask this. Are you under the influence of any
22 drugs or alcohol that would prevent you from answering
23 or understanding the question properly?
24     A. No.
25     Q. And if I ask you a question and you don't

## Page 5

1  understand it, will you be able to let me know that you
2  don't understand it so that I can ask it in a way that
3  you will understand it?
4      A. Sure.
5      Q. Where are you employed, Ms. Evans?
6      A. Credit Protection Association.
7      Q. And how long have you been employed there?
8      A. 32 years.
9      Q. And what's your job title now?
10     A. Executive vice president of operations.
11     Q. How long have you been executive vice president
12 of operations?
13     A. Five years.
14     Q. What was your title before that?
15     A. Vice president of operations.
16     Q. And what was -- were you vice president of
17 operations for the 27 years prior to that?
18     A. No, probably 15, 20.
19     Q. And before vice president of operations, what
20 was your title?
21     A. I don't remember the title, marketing director
22 for --
23     Q. Did you start as a collector?
24     A. No.
25     Q. When you started, what was your title?

6

1  A. I was a telemarketer.
2  Q. And as executive vice president -- executive
3  vice president in charge of operations --
4  A. Yeah.
5  Q. -- is that what you said your current job title
6  is?
7  A. Yes.
8  Q. What are your job duties?
9  A. I'm in charge of the collection strategies and
10 the call center and analysis on results and things such
11 as that and future business plans.
12  Q. Have you had a chance to look over the
13 deposition notice in this case?
14  A. Yes, I did.
15  Q. And what about the complaint and the answer
16 are you familiar with those?
17  A. Somewhat.
18  Q. What else did you do to prepare for the depo
19 today?
20  A. Talked with John.
21      MR. GASET: I'm going to object to the
22 extent that it's attorney-client privilege, her
23 communications with me.
24      Other than that, you're free to answer,
25 Diane.

7

1  A. I just reviewed the materials in the file.
2  Q. And when you say, "the materials in the file,"
3  what materials did you review?
4  A. I think it's pretty much what has been sent to
5  you.
6  Q. And besides the materials that were sent to me,
7  what else did you review? What else did you do to
8  prepare for the deposition today?
9      MR. GASET: Objection again as it relates
10 to attorney-client privilege.
11  A. I just looked at what was in this file.
12  Q. And are you the only witness that CPA is
13 putting forth at the depo here today?
14  A. Yes.
15  Q. Does CPA intend to call any other witnesses
16 besides you at the trial in this matter?
17  A. No.
18      MR. GASET: Objection, work product.
19  Q. Ms. Evans, can you tell us what was the debt
20 that Credit Protection Association was trying to collect
21 from Mr. Alvarado?
22  A. Can you define "debt," please?
23  Q. Well, Credit Protection Association made some
24 phone calls to Benjamin Alvarado, didn't they?
25  A. I believe so.

8

1  Q. And what were those phone calls about?
2  A. About some money he owed.
3  Q. Okay. So Mr. Alvarado owed money to Credit
4  Protection Agency?
5  A. No.
6  Q. Or I'm sorry, to CPA?
7  A. No.
8  Q. Okay. So when you say those calls were about
9  money he owed, who did he owe the money to?
10  A. Bright House Networks.
11  Q. So CPA was calling Mr. Alvarado about money he
12 owed to Bright House Networks; is that right?
13  A. Correct.
14      MR. GASET: Objection, form.
15  Q. And is it your -- is it your contention that
16 that money that he owed is not a debt?
17  A. It's a definition of debt.
18  Q. Okay. So --
19  A. But there's several.
20  Q. Okay. So Mr. Alvarado owed a debt to Bright
21 House, and CPA was calling about that debt; is that
22 right?
23      MR. GASET: Objection to form.
24  A. Money he owed, yes.
25      MR. GIARDINA: So you've got an objection

9

1  to the form, but can you tell me -- because I want to
2  phrase it in a way that doesn't have an objection --
3  what is your objection to the form?
4      MR. GASET: It's leading.
5  Q. When, Ms. Evans, did CPA start making calls to
6  Mr. Alvarado about the money he owed to Bright House?
7  A. March.
8  Q. Now, I see you're reviewing some documents.
9  What documents do you have there? I can't tell what
10 they are.
11  A. It's a call log.
12  Q. Okay. Is that the call log that is --
13      MR. GIARDINA: Madam Court Reporter, could
14 you please hand the witness what's been marked as
15 Exhibit 4.
16  Q. Is this the document that you are -- that you
17 were referring to just a moment ago?
18  A. Yes.
19  Q. And what's the title of this document?
20  A. It's several documents together.
21  Q. Okay. So let's go through page 1. What is
22 this document called?
23  A. That is a -- I forget what -- it's a debtor
24 account lookup.
25  Q. And who prepared this?

**Page 10**

1  A. I don't know.
2  Q. Do you know what software was used to prepare
3  this?
4  A. A software doesn't prepare a piece of paper.
5  Q. Okay. Was this -- was this debtor account
6  lookup, as you call it, was this just somebody typed
7  this in, or is this a printout or a report?
8  A. It's a printout.
9  Q. Okay. And is it a printout from a specific
10  computer program?
11  A. Yes.
12  Q. What's the name of that program?
13  A. Etech.
14  Q. Etech?
15  A. Yes.
16  Q. Could you spell that, please?
17  A. E-T-E-C-H.
18  Q. And who publishes Etech?
19  A. I don't understand your question.
20  Q. Is Etech the name of the publisher?
21  A. You have to define "publisher."
22  Q. Well, Microsoft Word is a program that's
23  published by Microsoft, right? Outlook is a program
24  that's published by Microsoft. Is Etech the name of the
25  software company or the name of the software program?

**Page 11**

1  A. The software program.
2  Q. And what's the name of the software company
3  that makes Etech?
4  A. Credit Protection Association.
5  Q. And who at -- who at Credit Protection
6  Association -- I'm sorry, let me start over.
7       Was it an employee of Credit Protection
8  Association that wrote this software?
9  A. Many.
10  Q. Was it made in-house, or was it made with an
11  outsourced programming company?
12  A. In-house.
13  Q. Let's move to page 2. Can you identify this
14  page?
15  A. That's the history on the account.
16  Q. And was this also prepared using Etech?
17  A. It's a printout of Etech.
18  Q. And page 3, is page 3 a printout of Etech?
19  A. Yes.
20  Q. And what about page 4?
21  A. What about it?
22  Q. Is this a printout of Etech?
23  A. Yes.
24  Q. And does this document have a title?
25  A. This is the notes.

**Page 12**

1  Q. Okay. You know, I'm sorry, Ms. Evans, I didn't
2  get the title of page 3; what was the title of that?
3  A. History.
4  Q. So pages 2 and 3 are titled History; is that
5  correct?
6  A. Correct.
7  Q. And what about page 5?
8  A. What about it?
9  Q. What is the title of page 5?
10  A. There's not a title on here.
11  Q. Okay. Have you seen this document before?
12  A. Yes.
13  Q. And what is this document?
14  A. We refer to it as a call log.
15  Q. Call log. Page 6, is that also part of the
16  call log?
17  A. Yes.
18  Q. And what's page 7?
19  A. It outlines the text that was sent.
20  Q. When you say, "It outlines the text that was
21  sent," was this page generated by Etech?
22  A. No.
23  Q. What program generated this page?
24  A. I don't know what the program name is.
25  Q. Besides these documents, pages 1 through 7

**Page 13**

1  labeled Exhibit 4, are there any other documents that
2  contain information about this account?
3       MR. GASET: Objection for attorney-client
4  privilege.
5       As far as that's relevant, you can answer.
6  A. Not to my knowledge.
7  Q. So to your knowledge, all of the information
8  that CPA has about this account is in these seven pages?
9  A. Correct.
10  Q. Drawing your attention to page 1, which I
11  think -- did you call that the notes?
12  A. No.
13  Q. What was the title of this one, the printout?
14  A. I don't remember the official title.
15  Q. Okay. Well, drawing your attention to page 1
16  of Exhibit 4, I see a lot of codes on here that I don't
17  know what they mean. For example, at the top left, it
18  says, C2AD160; do you see that?
19  A. Yes.
20  Q. What does that mean?
21  A. I don't know.
22  Q. Okay. Underneath that, it says, Client, Bright
23  House Networks. This number, 027101, do you see that
24  number?
25  A. Yes.

14

1  Q. What does that mean?
2  A. Their client number.
3  Q. Does Bright House have more than one client
4  number?
5  A. I believe so.
6  Q. How many client numbers does it have?
7  A. I don't know.
8  Q. And underneath number, there's an account
9  number starting with 8223; what account number is this?
10  A. Bright House' account number.
11  Q. So this isn't a number assigned by CPA, it's a
12  number assigned by Bright House?
13  A. Correct.
14  Q. On that same column, sort of in the middle,
15  you'll see it says, Submit Date, 12/31/2012. Can you
16  please explain what the submit date is?
17  A. The date it was entered in our system.
18  Q. And what does Closed Date mean?
19  A. The date it was closed in our system.
20  Q. Beneath that, there's a Letter number, 3831;
21  can you tell me what that means?
22  A. That that letter was sent.
23  Q. Okay. What letter was sent?
24  A. Number 3831.
25  Q. And when was Letter 3831 sent?

15

1  A. I can't tell from this page.
2  Q. Beneath 3831 where it says, Letter Date,
3  9/16/2013, do you see that?
4  A. Oh, yes, that may be the date.
5  Q. Now, after that, we have Strategy number, 25;
6  can you please explain what that means?
7  A. That's just the strategy that is assigned to
8  this client and this account.
9  Q. I don't think I understand. There's several
10  different strategies?
11  A. Correct.
12  Q. Okay. And who makes the decision about what
13  strategy will be assigned to each account?
14  A. Several people.
15  Q. Who are those people?
16  A. Myself, assistant operations manager, the
17  executive IT manager, our customer service
18  representatives, and analysts. It's a group of people.
19  Q. And what does Strategy Number 25 consist of?
20  A. I don't know.
21  Q. But you helped to decide this strategy, right?
22  A. Yes.
23  Q. Why did you choose Strategy 25?
24  A. It's a random number assigned to a strategy.
25  Q. Can you explain what a strategy is?

16

1  A. A strategy is the steps that the account goes
2  through during the collection cycle.
3  Q. So did this -- was this account always a
4  Strategy 25, or is it a dynamic thing that changes?
5  A. It can change.
6  Q. After that, we've got Strategy Line 0430. Can
7  you explain what that means?
8  A. That is the place that the account is in in the
9  strategy.
10  Q. Okay. So a strategy is -- is there a Strategy
11  Number 24?
12  A. I don't know.
13  Q. Moving on to the next column, we have a Hold
14  Date; can you please explain what a Hold Date is?
15  A. Hold Date is the date a hold code is entered on
16  the account and activity is stopped or ceased.
17  Q. And what about Wait Date?
18  A. That is the date that the strategy is looking
19  at for the next step.
20  Q. And beneath that, it says, Disc Date, D-I-S-C
21  D-T-E; what does that mean?
22  A. Disconnect date.
23  Q. What is the disconnect date?
24  A. The date they were turned off with service at
25  Bright House.

17

1  Q. Beneath that, there's a number of -- Ms. Evans,
2  I can't help but notice that you're checking your phone,
3  and I'm wondering if you would be so kind as to maybe
4  put your phone away during the course of the depo --
5  A. Okay.
6  Q. -- and maybe consult it when we have a break or
7  something.
8  A. Okay.
9  Q. Do you need to take a break to check your
10  phone?
11  A. No, I'm fine.
12  Q. Beneath that, we've got, Number of Letters
13  Sent, and this is on page 1 of Plaintiff's Exhibit 4 in
14  the middle column, Number of Letters Sent, 9. Can you
15  tell me what that means?
16  A. We sent nine letters.
17  Q. CPA sent nine letters?
18  A. Yes.
19  Q. Did you have a copy of these letters?
20  A. No, not personally.
21  Q. Did CPA save copies of these letters?
22  A. No.
23  Q. Do you know what time or date the letters were
24  sent?
25  A. Not on -- from this page.

18

1 Q. Is there any information in front of you that
2 would tell you what time or date the letters were sent?
3 A. One letter on 9/16.
4 Q. Okay. And does CPA have any way of knowing
5 what dates or times the letters were sent?
6 A. Yes.
7 Q. And how would CPA find out what dates or times
8 the letters were sent?
9 A. We would look in the history.
10 Q. And do we have the history here?
11 A. Yes.
12 Q. Okay. The history is page 2?
13 A. Yes.
14 Q. Okay. Let's move to page 2. And I notice from
15 page 2 and page 3 -- is page 3 just a continuation of
16 page 2?
17 A. It precedes.
18 Q. When you say, "It precedes," what do you mean?
19 A. It should come before page 2.
20 Q. Okay. And all of these dates, are these dates
21 that -- can you identify the dates in page 2 and 3 when
22 the nine letters were sent to Mr. Alvarado?
23     MR. GASET: I'm sorry, James, I just want
24 to throw an objection on the record.
25     MR. GIARDINA: Oh, let me give you what

19

1 I've got. Do you have it?
2     MR. GASET: For the record, I do have
3 copies of the exhibits.
4     I just want to throw an objection on the
5 record. As far as relevancy to the discussion about
6 letters, there's no letters alleged in the complaint.
7 I'll leave it at that.
8     MR. GIARDINA: Okay. Great.
9 Q. So drawing your attention to page 3, 12/31/2012
10 is the last line on page 3. Is that the first date of
11 activity on this account?
12 A. Yes.
13 Q. Okay. And it says, Sent Letter Number 0101.
14 Can you tell me what happened on this date?
15 A. We sent out our first letter.
16 Q. And who writes that first letter?
17 A. A printer.
18 Q. Well, that letter was written by somebody,
19 wasn't it?
20 A. Yes.
21 Q. Who is the author of that letter?
22 A. The team that works on the strategy and our
23 outside counsel.
24 Q. Okay. And who is the team -- what are the
25 names of the people on that team?

20

1 A. It's going to be different at this time than it
2 is now, so I can't answer that question.
3 Q. So you don't know who wrote the letter then to
4 Mr. Alvarado on 12/31/2012?
5 A. I do not know who all -- off the top of my
6 head, who was involved in compiling that letter.
7 Q. Now, above that, on 12/31/2012, there's another
8 entry; can you explain what that entry means?
9 A. That the account was sent down for a call.
10 Q. And that's Debtor Extracted for Call?
11 A. Correct.
12 Q. When you say, "the account was sent down for a
13 call," what do you mean?
14 A. It was -- it was downloaded.
15 Q. The account was downloaded?
16 A. Uh-huh.
17 Q. What was downloaded?
18 A. The account number, the phone number, the name.
19 Q. Was downloaded to where?
20 A. To a file.
21 Q. From where?
22 A. Etech.
23 Q. So on 12/31/2012, Etech caused the account to
24 be downloaded to a file?
25 A. Correct.

21

1     MR. GASET: Objection as to form.
2 Q. And when you say, "downloaded," do you mean
3 transferred to a different computer?
4 A. No.
5 Q. What would be the purpose for extracting -- for
6 downloading the account to another file?
7 A. So we can upload that file into another
8 program.
9 Q. And what's that other program?
10 A. Dial Connection.
11 Q. So does this entry on 12/31/2012 mean that a
12 call was made on this date?
13 A. No.
14 Q. But it does mean that it was downloaded to
15 another program, correct?
16 A. To a file.
17 Q. To a file. What's the name of that file?
18 A. I don't know.
19 Q. On 1/14/2013, it says, Sent Letter Number; do
20 you see that?
21 A. I do.
22 Q. Can you tell me what happened on that date?
23 A. A letter was extracted to be generated.
24 Q. And that was Letter 102?
25 A. Yes.

## Page 22

1  Q. Do you know the author of Letter 102?
2  A. No.
3  Q. On 1/21/2013, it says, Debtor Extracted For
4  Call; can you explain what that means?
5  A. That the account was downloaded to a file.
6  Q. Now, after that, we've got numbers 3838; what
7  does that mean?
8  A. The type of call.
9  Q. What type of call was 3838?
10  A. I don't know.
11  Q. Now, when you say, "type of call," what do you
12  mean?
13  A. If it's the first call, the second call. It
14  could be...
15  Q. It could be what?
16  A. It could stand for several things.
17  Q. Like what?
18  A. Like it could be used to determine what
19  campaign it goes into.
20  Q. Now, moving up to 1/31/2013, that's the next
21  entry, right?
22  A. Yes.
23  Q. Sent Letter Number 4204. What kind of letter
24  is 4204?
25  A. Collection letter.

## Page 23

1  Q. And how does 4204 differ from Letter 102?
2  A. Wording.
3  Q. And where was that letter sent?
4  A. Where was it sent?
5  Q. Yeah. It says, Sent Letter Number; does that
6  mean that CPA mailed the letter?
7  A. It means that it went to the file to be sent.
8  Q. Okay. Can you describe what that means, went
9  to a file to be sent?
10  A. The account gets downloaded to a file, sent to
11  a printer, gets printed, and mailed out the door.
12  Q. And who made the decision to mail that letter
13  on that date?
14  A. The strategy.
15  Q. So the computer?
16  A. The strategy.
17  Q. Okay. Did a person decide on 1/31/2013 to send
18  that letter?
19  A. No.
20  Q. Going up to 2/05/2013, it says, Sent Text
21  Message 3888; do you see that?
22  A. Yes.
23  Q. What does that mean?
24  A. It means it was downloaded to a file to have a
25  text sent on it.

## Page 24

1  Q. And who made the decision to send that text?
2  A. The strategy.
3  Q. Did a person make the decision to send that
4  text?
5  A. No.
6  Q. Next, 2/15/2013, Debtor Extracted For Call,
7  344; can you tell me what happened that day?
8  A. It was downloaded to a file.
9  Q. What was downloaded to a file?
10  A. The account.
11  Q. Okay. And what does "Extracted For Call" mean?
12  A. It means that it has copied the information
13  from the account to a file.
14  Q. Etech copied the information from the account?
15  A. Yes.
16  Q. For the purpose of making a phone call; is that
17  correct?
18  A. Correct.
19  Q. And who decided at that time -- on 2/15/2013,
20  who decided to call Mr. Alvarado?
21  A. The strategy.
22  Q. Did a person decide to call him at that time?
23  A. No.
24  Q. And can you describe how he was called?
25  A. Through Dial Connection.

## Page 25

1  Q. So can you explain how the strategy causes Dial
2  Connection to make a call?
3  A. The strategy causes it to go to a file, the
4  file is uploaded into Dial Connection, and Dial
5  Connection dials the phone numbers that are fed into it.
6  Q. Now, when the computer is -- when the file is
7  uploaded to Dial Connection, is there a person doing
8  that uploading or is it automatic?
9  A. It's automated.
10  Q. Now, going back to the previous page, which I
11  guess is the next page chronologically, we've got date
12  2/20/2013. Can you describe what happened on that date?
13  A. The account was extracted for a -- or
14  downloaded for a letter.
15  Q. And did Dial Connect send -- I'm sorry, did CPA
16  send a letter on that date?
17  A. Yeah. It may have been sent on that day, maybe
18  the day after.
19  Q. What about 2/25/13, what happened on that date?
20  A. The account was downloaded to a file for call.
21  Q. And was Mr. Alvarado called that day?
22  A. I can't tell by this.
23  Q. So when a file says, Extracted For Call, that
24  doesn't mean that a call was actually made?
25  A. Correct.

26

1 Q. What does it mean then?
2 A. It means it went to --
3     MR. GASET: Objection to form, asked and
4 answered.
5 Q. Well, I'm not -- so Extracted For Call begins a
6 process of sending instructions to Dial Connect?
7 A. Extracted For Call sends the account to a
8 download file.
9 Q. And when an account is in a download file, is
10 it sent immediately to Dial Connect?
11 A. Not immediately.
12 Q. How much time goes by between the time that a
13 file is extracted for call and the file is sent to Dial
14 Connect?
15 A. It would vary.
16 Q. But does it take -- is it a matter of minutes,
17 or is it -- how often does it happen?
18 A. Daily.
19 Q. So if a call is extracted for call, it's -- if
20 an account is extracted for call, CPA wants a call to be
21 made on that number; is that right?
22 A. Correct.
23     MR. GASET: Objection to form.
24 Q. So at 3/7/13, what happened on that date?
25 A. The account was flagged to go to the credit

27

1 bureau.
2 Q. On 3/12/13, what happened?
3 A. The account was sent to a file to generate a
4 letter.
5 Q. And was Mr. Alvarado sent a letter on that
6 date?
7 A. I don't know. It would be close to --
8 Q. But he was sent a letter because of that entry?
9 A. Correct.
10 Q. And was he sent a letter because of the entry
11 on 3/27/2013?
12 A. Yes.
13 Q. And was he sent a letter because of the entry
14 on 5/2/2013?
15 A. Yes.
16 Q. And do you know the authors of any of these
17 letters?
18 A. Not off the top of my head.
19 Q. Do you know the contents of any of these
20 letters?
21 A. Not exactly.
22 Q. On 5/22/2013, there's another entry. Do you
23 see that?
24 A. Yes.
25 Q. Did CPA instruct Dial Connect -- Dial

28

1 Connection to make a call because of this entry?
2 A. It would be downloaded to the file and uploaded
3 into Dial Connection.
4 Q. So every time that we see on here Debtor
5 Extracted For Call, the account was downloaded to a
6 file; is that correct?
7 A. Yes.
8 Q. And every time it was downloaded to the file,
9 that file was uploaded to Dial Connection?
10 A. Correct.
11 Q. And every time it was uploaded to Dial
12 Connection, Dial Connection was given instructions to
13 call on that account at that time, correct?
14 A. If it met certain criteria, yes.
15 Q. What are those criteria?
16 A. There's all kinds. I'm not sure what it would
17 be for this.
18 Q. Is there any reason why Dial Connect wouldn't
19 call someone after an entry stating Debtor Extracted For
20 Call?
21 A. Yes.
22 Q. And can you describe why Dial Connect would not
23 make the call after a call was extracted for call?
24 A. Because perhaps that person called us before it
25 was queued up to be called.

29

1 Q. What other reasons would Dial Connect have for
2 not -- let me start over. Are there any other reasons
3 why Dial Connect would not call someone after their
4 account was extracted for call?
5 A. If they made a payment.
6 Q. If they made a payment, if they called in.
7 What other reasons?
8 A. Somehow their account got to a zero balance.
9 Q. Any other reasons?
10 A. If it was -- if a client informed us that they
11 had claimed bankruptcy or cease and desist or any of
12 those reasons.
13 Q. And how long does it usually take for a call to
14 be extracted to the download file before the call is
15 placed by Dial Connect?
16 A. Within 24 hours.
17 Q. And do you know the contents of the call that
18 was placed as a result of the entry on 5/22/2013?
19 A. No.
20 Q. The code, 3198, does that mean that this was a
21 different call -- a different message than perhaps the
22 code previously, 3840?
23 A. Not necessarily.
24 Q. So a call could have two different codes and
25 have the same language?

**Page 30**

1  A. It could have five different codes and have the
2  same language.
3  Q. Moving up to 6/24/2013, did Dial Connect make a
4  call as a result of this entry?
5  A. I can't tell by this.
6  Q. Was Dial Connect instructed by CPA to make a
7  call as a result of this entry?
8  A. It would have been uploaded into the dialer.
9  Q. So the call on 7/15/2013, that entry on
10 7/15/2013, was that uploaded into the dialer?
11 A. Yes.
12 Q. And on 9/16/2013, was that loaded into the
13 dialer?
14 A. Yes.
15     MR. GASET: Objection to form.
16     MR. GIARDINA: What's your objection?
17     MR. GASET: She said, file, not dialer.
18     MR. GIARDINA: No, she said uploaded to the
19 dialer.
20     MR. GASET: Is that what she's been saying?
21     MR. GIARDINA: Yeah.
22 Q. So how many times, Ms. Evans, was
23 Mr. Alvarado's account uploaded to the dialer?
24 A. It looks like from this eight times it was sent
25 to Dial Connection.

**Page 31**

1  Q. Besides those eight times, is there any reason
2  why Dial Connect -- Dial Connection would call him more
3  than that?
4  A. Yes.
5  Q. What other reasons would Dial Connect have for
6  calling him?
7  A. Depending on the strategy, Dial Connection may
8  have called him more than once.
9  Q. So for example, let's take the first one on
10 page 2, 2/25/2013, Debtor Extracted For Call, 3840.
11 When the account goes into the file for download,
12 depending on the -- I guess I don't understand when you
13 say Dial Connect could have called him more than once.
14 Could they have called him more than once as a result of
15 the entry on 2/25/2013?
16 A. Yes.
17 Q. And how do we know how many times they would
18 have called him on that date?
19 A. It'd depend on the strategy or the campaign.
20 Q. Now, what's that?
21 A. On the campaign.
22 Q. On the campaign or on the strategy?
23 A. On the campaign.
24 Q. And what campaign is this?
25 A. I don't know.

**Page 32**

1  Q. Are there documents anywhere -- anywhere in
2  this document, does it evidence the campaign number?
3  A. If it does, I'm unaware.
4  Q. Okay. So strategy and campaign is different?
5  A. Yes.
6  Q. Can you describe the difference between --
7  explain the difference between strategy and campaign?
8  A. A campaign is how we treat the call when it
9  comes down to Dial Connection.
10 Q. So how many times was Mr. Alvarado called as a
11 result of the entry on 3/12/2013?
12 A. I don't know.
13 Q. Who would know?
14 A. I would know. It's just not on this piece of
15 paper.
16 Q. Okay. So I'm asking you --
17 A. I don't know off the top --
18 Q. -- what documents would you need to refer to to
19 find out?
20 A. The call log.
21 Q. Okay. And do we have a copy of the call log?
22 A. Yes.
23 Q. Okay. Is that page 5?
24 A. That's part of it.
25 Q. Now, when you say it's part of it, there's

**Page 33**

1  other parts of the call log besides page 6 --
2  A. No.
3  Q. -- or is page 6 the only other part of it?
4  A. 6 is the only.
5  Q. Now, on these -- this first column, they look
6  like dates, but they're not in order. Can you explain
7  what's going on here?
8      MR. GASET: What page are you referring to?
9      MR. GIARDINA: Page 5 of Exhibit 4.
10 A. No.
11 Q. Okay. Are these dates in column one?
12 A. Yes.
13 Q. And are these dates -- what do these dates
14 signify?
15 A. The date the number was called.
16 Q. So for example, let's just take the first one
17 in the column, 1/25/13. What happened on that day?
18 A. A call was made.
19 Q. And who was the call made to?
20 A. Phone number 813-748-1968.
21 Q. Now, it says, SADAM; are those initials?
22 A. No, it's a --
23 Q. Is that an acronym?
24 A. -- result code.
25 Q. And what does that result code mean?

**Page 34**

1  A. That we left a message.
2  Q. So what does "SADAM" stand for?
3  A. I don't know.
4  Q. Now, if you'll look on 10/13 -- 10/3/13, sort
5  of in the middle of the page, we have a different result
6  code, SAAMP. What does that result code mean?
7  A. That we left a message.
8  Q. How does that differ from SADAM?
9  A. I don't know. I'd have to look at the other
10 page.
11 Q. You can look. Do you need a minute to look and
12 let me know?
13 A. Yeah, but I -- we left them an IVR message.
14 Q. What does IVR mean?
15 A. Interactive voice response.
16 Q. And what is an interactive voice response
17 message?
18 A. What is it?
19 Q. Yeah, could you define it?
20 A. It is a message that is prerecorded.
21 Q. And can you let me know what -- so that's what
22 code SAAMP means is prerecorded message?
23 A. If I paired them up correctly.
24 Q. Okay. So on 1/25/13, was a prerecorded message
25 left?

**Page 35**

1  A. Yes.
2  Q. Was a prerecorded message left on 9/23/13?
3  A. Yes.
4  Q. On 9/26/13, was a prerecorded message left?
5  A. Yes.
6  Q. What about 1/23/13, was a prerecorded message
7  left then?
8  A. Yes.
9  Q. Are there any dates on document -- on this
10 page, page 5, when anything other than a prerecorded
11 message was left?
12 A. Not to my knowledge.
13 Q. So is it your position that each and every call
14 made -- I'm sorry, each and every date on page 5
15 represents a call that was made to 813-748-1968?
16 A. Yes.
17 Q. And is it your position that each and every one
18 of these calls resulted in a prerecorded message being
19 left at that number?
20 A. Yes, we left a message.
21 Q. And what's the -- is this the total number of
22 times that Mr. Alvarado was called?
23 A. Yes.
24 Q. He was called on no other times besides those
25 listed here, correct?

**Page 36**

1  A. Correct.
2  Q. And I'm just counting these up. How many calls
3  were made then?
4  A. If I counted right, 29.
5  Q. Were any of these 29 calls made for emergency
6  purposes?
7  A. No.
8  Q. And do you know the name of the person that
9  dialed the first call, 1/25/13?
10 A. There is no person.
11 Q. They were made by a machine?
12 A. It was made by Dial Connection.
13 Q. Following the strategy set forth by CPA, right?
14 A. Correct.
15 Q. Now, what type of machine did CPA use to make
16 the calls?
17 A. A predictive dialer.
18 Q. And where is that dialer located?
19 A. We have several locations.
20 Q. Were these calls, these 29 calls, were these
21 made from different locations?
22 A. I don't know.
23 Q. Do you know the model for the predictive
24 dialer?
25 A. No.

**Page 37**

1  Q. Do you know the manufacturer name of the
2  predictive dialer?
3  A. Dial Connection.
4  Q. Now, for each of these calls made by -- so for
5  each of these calls made, how did Dial Connection know
6  to call them at the certain times and dates that it did
7  call them?
8  A. Based on the campaign and the strategy.
9  Q. Now, I know we talked about the strategy
10 earlier, but we didn't talk about the campaign. Who
11 develops the campaign? Is that developed by Dial
12 Connect?
13 A. No.
14 Q. Is that developed by CPA?
15 A. Yes.
16 Q. Now, those messages, these 29 prerecorded
17 messages, were they a recording of someone's voice or
18 was it an artificial voice?
19 A. It would have been a combination of both.
20 Q. For each call?
21 A. I believe so.
22 Q. How did -- how did Dial Connect obtain this
23 number, 813-748-1968?
24 A. From the download file.
25 Q. And who provided that number? Who provided

```
                                                         38
 1  that download file to Dial Connect?
 2      A.  CPA.
 3      Q.  And how did CPA obtain the number?
 4      A.  From Bright House.
 5      Q.  How did CPA obtain it from Bright House?
 6      A.  They sent it to us in a file.
 7      Q.  By date of transfer?
 8      A.  I'm not sure how they -- yes.  I'm not sure how
 9  they transfer.
10      Q.  But it wasn't -- was it them dropping off an
11  envelope with files in it?
12      A.  No.
13      Q.  It was through the Internet?
14      A.  I don't know how it came to us.
15      Q.  When it did come to you, when Mr. Alvarado's
16  file did arrive at CPA, who received it?
17      A.  I don't know.
18      Q.  What was provided to CPA by Bright House
19  regarding Mr. Alvarado?
20      A.  The information you see on the account history.
21      Q.  Besides the information on the account -- and
22  now, that's page 1 of Exhibit 4?
23      A.  Yes.
24      Q.  Besides the information on page 1 of Exhibit 4,
25  did Bright House provide any other information to CPA
```

```
                                                         39
 1  regarding Mr. Alvarado?
 2      A.  I don't know.
 3      Q.  Who would know?
 4      A.  I'd have to look in the file to see if there
 5  was any other information in the record.
 6      Q.  So this isn't the complete record?
 7      A.  I can't answer that.  It may be.
 8      Q.  Why not?
 9      A.  It may be, it may not.
10      Q.  Does CPA perform cell scrubs?
11      A.  When an account is skip traced.
12      Q.  Was this account skip traced?
13      A.  No.
14      Q.  Was a cell scrub performed on this account?
15      A.  No.
16      Q.  What is CPA's policy regarding numbers that it
17  identifies as cell phone numbers when using a cell
18  scrub?
19      A.  When it comes from skip tracing?
20      Q.  Anytime it uses cell scrub.
21      A.  We don't call it.
22      Q.  But no cell scrub -- was a cell scrub run on
23  this account?
24      A.  No.
25      Q.  When Bright House gave CPA the number, did they
```

```
                                                         40
 1  make any representations that it was obtained with
 2  Mr. Alvarado's consent --
 3      A.  Yes.
 4      Q.  -- to receive -- so Bright House warranted the
 5  information?
 6      A.  They don't warrant it, but it's -- that's what
 7  they provide us.
 8      Q.  What is what they provide you?
 9      A.  The numbers that they provide in the file are
10  the numbers that are obtained by the consumer.
11      Q.  And does Bright House make any representations
12  that the consumer consented to receive prerecorded
13  messages at that number?
14      A.  I don't know.
15      Q.  Does CPA have any proof that Mr. Alvarado
16  consented to receive prerecorded messages to his cell
17  phone number?
18      A.  That was the number he provided to Bright
19  House.
20      Q.  So is it your contention that Mr. Alvarado gave
21  his consent to Bright House to receive calls with a
22  recorded message?
23          MR. GASET:  Objection as to form.
24      A.  Not for a recorded message but for -- in the
25  course of business.
```

```
                                                         41
 1      Q.  So can you explain that?
 2      A.  He provided that number to Bright House to
 3  contact him, anything concerning this account.
 4      Q.  But Bright House didn't say anything one way or
 5  the other about a prerecorded message; is that what
 6  you're saying?
 7      A.  I don't know.
 8      Q.  Now, in this case, Mr. Alvarado claims that he
 9  did not consent to receive the prerecorded messages and
10  CPA denied that.  Can you tell me what the basis is of
11  CPA's denial?
12      A.  It was provided to Bright House.
13      Q.  What was provided to Bright House?
14      A.  His telephone number was provided to Bright
15  House.
16      Q.  Besides that, besides that his telephone number
17  was provided, besides what you just said, is there any
18  other factual basis for CPA's denial of Mr. Alvarado's
19  contention that he did not consent to receive those
20  calls?
21          MR. GASET:  Objection as to form.
22      A.  I'm not sure I understand what you're asking
23  me.
24      Q.  So Mr. Alvarado contends that he didn't consent
25  to these calls.  CPA has denied that in their pleadings,
```

**Page 42**

1  and I want to know what CPA's basis is for that denial.
2  And you have told me previously that the number was
3  provided to Bright House.  Are there any other reasons
4  why CPA would deny that?
5      A.  No.
6      Q.  You said earlier that you reviewed the
7  complaint in this matter.  Are you aware that
8  Mr. Alvarado contends that calls were placed to him in
9  which CPA did not disclose the fact that they were a
10 debt collector or did not state the name of the company?
11     A.  Yes.
12     Q.  I provided copies of those calls in question to
13 your attorney.  Did you have a chance to review them?
14     A.  What calls?
15     Q.  Have you -- the recordings.  In Counts 1 and 2
16 of the complaint, Mr. Alvarado alleges -- Count 1,
17 Mr. Alvarado alleges he received a call from CPA that --
18 if you want to look at the Exhibit 6.
19         MR. GIARDINA:  Madam Court Reporter, if you
20 wouldn't mind handing the witness Exhibit 6.
21     Q.  If you look at page 5.  In fact, it's paragraph
22 21 -- I'm sorry, not 21, 23.  In paragraph 23 of the
23 complaint, Mr. Alvarado is stating that CPA placed calls
24 to him without disclosing its name.  Are you aware of
25 that?

**Page 43**

1      A.  I'm aware he claims that.
2      Q.  And are you aware that Mr. Alvarado has
3  provided your counsel with recordings of those messages?
4      A.  I don't believe so.
5      Q.  So you haven't listened to those messages?
6      A.  No.
7      Q.  Can you describe, please, what procedures CPA
8  has in place to avoid -- to make sure that all -- sorry,
9  I have to rephrase that, restart that.  What procedures
10 does CPA have in place to make sure that consumers don't
11 receive calls where a CPA doesn't identify themselves?
12     A.  We have no recordings.
13     Q.  What do you mean?
14     A.  We have no recordings that don't identify us.
15     Q.  So do you have procedures in place to make sure
16 that all of your calls contain your name?
17     A.  It's the only possible recording anyone could
18 get.
19     Q.  So what are the procedures?
20     A.  The procedures are to play the full message
21 every time we make a call.
22     Q.  And what procedures do you have to make sure
23 that the full message is played?
24     A.  We have -- we can look at the length of the
25 call.

**Page 44**

1      Q.  So do you know the length of the calls that
2  were placed to Mr. Alvarado?
3      A.  No.
4      Q.  What other procedures do you have in place to
5  make sure that the whole message is played?
6      A.  We have the account seeded.
7      Q.  What does that mean?
8      A.  That means we put our own phone numbers in
9  there to hear the calls.
10     Q.  Can you describe -- seeded, how are you
11 spelling that, S-E-E-D or S-E-A-T?
12     A.  I think it's S-E-E-D.
13     Q.  S-E-E-D.  So can you describe the procedure for
14 seeding an account?
15     A.  We just randomly put our own phone numbers and
16 information into our files.
17     Q.  When you say, "we," who do you mean?
18     A.  CPA.
19     Q.  So what does that do?  What's the purpose of
20 that?
21     A.  To make sure the messages are all playing
22 properly.
23     Q.  But how does that help you know?  I think I
24 don't understand what you mean.
25     A.  It calls our phones.

**Page 45**

1      Q.  So it calls your cell phone?
2      A.  Possibly, or home phone, whatever we put in
3  there.
4      Q.  What other procedures do you have in place to
5  make sure that all of your messages contain your full
6  name?
7      A.  None that I'm aware of.
8      Q.  What procedures do you have in place to make
9  sure that all of your messages disclose that you're a
10 debt collector?
11     A.  The same.
12     Q.  What do you mean, "the same"?
13     A.  That I just explained to you.
14     Q.  So I'm afraid I don't remember them.  Can you
15 tell me what procedures you have in place to prevent
16 calls from going out where you don't disclose that
17 you're a debt collector?
18     A.  There's no -- there's no recordings that exist
19 that do not identify us as a debt collector.
20     Q.  And then where are those recordings made?  Are
21 they made by Dial Connect, or are they made by CPA?
22     A.  I believe CPA.
23     Q.  And then CPA, what, uploads them to Dial
24 Connect?
25     A.  I'm not sure of that procedure.

46

1 Q. But CPA somehow sends them to Dial Connect; is
2 that correct?
3 A. Correct. Or we may publish them ourselves. I
4 don't know that procedure.
5 Q. Now, once they're sent to Dial Connect, how
6 does CPA control -- how does CPA ensure that the whole
7 message is played?
8 A. I don't know if they're sent to Dial Connect.
9 Q. Well, how does a message recorded by -- how
10 does a message prepared by CPA get to a phone when the
11 call is made by Dial Connect?
12 A. We could publish the recordings into Dial
13 Connection ourselves. It's possible. I don't know what
14 we did.
15 Q. Okay. So when you say you could publish the
16 recordings into Dial Connection yourself, does that mean
17 that Dial Connect can leave whatever message they want?
18 A. No.
19 Q. Dial Connect can only leave a message that CPA
20 prepares, right?
21 A. Correct.
22 MR. GASET: Objection to form.
23 Q. And how does CPA ensure that that whole message
24 is played?
25 A. By the time of the calls.

47

1 Q. And how would you check the time of calls?
2 A. On a different report in Dial Connection.
3 Q. Is that a report that you could generate?
4 A. I believe so.
5 Q. Would you be able to provide me with a copy of
6 that report after this deposition?
7 A. I believe so.
8 Q. So after you send the message to Dial Connect,
9 when does Dial Connect know to make calls using that
10 message?
11 A. Based on the campaign.
12 Q. Besides recording the full message and besides
13 checking the time of the messages that are left, what
14 procedures does CPA have in place to make sure that the
15 fact that they're a debt collector is disclosed on every
16 call?
17 A. We randomly put in some of our own phone
18 numbers.
19 Q. Is that a company policy?
20 A. No.
21 Q. Is it a company policy to check the times of
22 the recordings?
23 A. Occasionally.
24 Q. Is that a written policy?
25 A. No.

48

1 Q. And who developed that policy?
2 A. The group that supports the dialer and myself.
3 Q. And how often do you check it?
4 A. It's not on a scheduled basis.
5 Q. When was the last time you checked it?
6 A. I don't remember.
7 Q. Have you checked it since this case was filed?
8 A. I don't know when this case was filed.
9 Q. Have you checked it in the last six months?
10 A. Oh, yeah.
11 MR. GASET: Objection to form.
12 Q. How many times have you checked it in the last
13 six months?
14 A. I don't know.
15 Q. Do you have any other procedures to make
16 sure -- besides those three things, do you have any
17 other procedures to make sure that CPA is identified as
18 a debt collector in every call?
19 A. Before I answer that, you need to tell me what
20 the three things are I'm agreeing to.
21 Q. You said no recordings exist, you said -- you
22 said checking the time, and you said putting in personal
23 phone numbers.
24 A. Then that's correct.
25 Q. What's correct?

49

1 A. Your previous question.
2 Q. So those are the only three ways that -- the
3 only three procedures that you have?
4 A. Yes.
5 Q. Does CPA have a policy on calling a debtor
6 who's represented by an attorney?
7 A. Yes.
8 Q. Can you describe that policy?
9 A. They're to cease and desist.
10 Q. Is that a written policy?
11 A. Yes.
12 MR. GIARDINA: Madam Court Reporter, I --
13 Q. Well, before we get there, Ms. Evans, could you
14 describe -- could you describe that policy? You said to
15 cease and desist, but I'm not sure -- I'm not sure
16 that's -- is that the whole policy, cease and desist?
17 A. Yes. You're to no longer contact that
18 consumer.
19 Q. Now, are you aware that Mr. Alvarado in this
20 case is alleging that CPA continued to contact him --
21 A. Yes.
22 Q. -- after he informed them --
23 A. Yes.
24 THE WITNESS: Excuse me, can we take a
25 break?

|  | 50 |
|---|---|
| 1 | MR. GIARDINA: Sure. |
| 2 | (Break taken from 1:11 p.m. to 1:16 p.m.) |
| 3 | Q. (BY MR. GIARDINA) Ms. Evans, are you familiar |
| 4 | with the term "call progress detection"? |
| 5 | A. No. |
| 6 | Q. Are you aware that in this case Mr. Alvarado is |
| 7 | alleging that he received several calls from CPA where |
| 8 | only a portion of the message was left? |
| 9 | A. Yes. |
| 10 | Q. What are CPA's procedures for ensuring that a |
| 11 | full message is left? |
| 12 | A. It's the only thing that exists. |
| 13 | Q. Only a full message exists? |
| 14 | A. Correct. |
| 15 | Q. So what are CPA's procedures -- does CPA have a |
| 16 | procedure for ensuring that the full message is played? |
| 17 | A. It's the only thing that exists. |
| 18 | MR. GASET: Objection as to form. She's |
| 19 | already asked and answered. I believe you did that |
| 20 | originally at the beginning. |
| 21 | Q. So the question is: Besides that the full |
| 22 | message is the only one that exists, what procedures |
| 23 | does CPA have in place -- what other procedures does CPA |
| 24 | have in place to make sure that the full message is |
| 25 | played? |

|  | 51 |
|---|---|
| 1 | A. We can look at the time of the recording. |
| 2 | Q. Now, looking at the time of the recording, that |
| 3 | tells you if an error happened, right? |
| 4 | A. It tells us if the whole message did not play. |
| 5 | Q. So how does CPA ensure that a whole message |
| 6 | plays? |
| 7 | A. We occasionally audit the time on the messages. |
| 8 | Q. And other than occasionally auditing the time |
| 9 | on the messages -- so auditing the time on the messages |
| 10 | that helps you see that a full message was not played, |
| 11 | right? |
| 12 | A. It shows us that it was played. |
| 13 | Q. Or if you got a short time, then it wasn't |
| 14 | played; would that be -- is that correct? |
| 15 | A. Yes. |
| 16 | Q. So how does CPA make sure that the full message |
| 17 | is played? |
| 18 | A. I can't control everything that happens, so if |
| 19 | there is an outage on a phone line in the middle of a |
| 20 | message, that's out of my control. I can just assure |
| 21 | that the message is played. |
| 22 | Q. Now, but CPA isn't making the calls, right? |
| 23 | A. Dial Connection is. |
| 24 | Q. So does Dial Connection have procedures in |
| 25 | place to make sure that the full message is played? |

|  | 52 |
|---|---|
| 1 | A. I'd have to ask them. |
| 2 | Q. Previously, Ms. Evans, you had mentioned that |
| 3 | Mr. Alvarado provided his phone number to Bright House; |
| 4 | do you remember that? |
| 5 | A. Uh-huh, yes. |
| 6 | Q. How do you know that he provided his number to |
| 7 | Bright House? |
| 8 | A. I have a work order. |
| 9 | Q. Is that work order in front of you? |
| 10 | A. No. |
| 11 | Q. In fact, I think -- |
| 12 | MR. GIARDINA: Madam Court Reporter, if you |
| 13 | could please hand the witness what's marked as |
| 14 | Exhibit 1. |
| 15 | Q. Is this the work order that you referenced, |
| 16 | Ms. Evans? |
| 17 | A. Yes. |
| 18 | Q. Is it CPA's position that the language in this |
| 19 | work order acts as a consent for Mr. Alvarado to receive |
| 20 | prerecorded calls to his cellular number? |
| 21 | A. Yes. |
| 22 | Q. There's another number here handwritten at the |
| 23 | bottom; do you see that, 813-463-8879? |
| 24 | A. Yes. |
| 25 | Q. Whose number is that? |

|  | 53 |
|---|---|
| 1 | A. I don't know. |
| 2 | Q. Now, do you see on this paper where |
| 3 | Mr. Alvarado provided -- you stated previously |
| 4 | Mr. Alvarado provided his number to Bright House, |
| 5 | correct? |
| 6 | A. Yes. |
| 7 | Q. And you stated previously that he provided it |
| 8 | to them in a work order, correct? |
| 9 | A. Correct. |
| 10 | Q. Can you show me on this work -- can you |
| 11 | identify on this work order where Mr. Alvarado provided |
| 12 | that number to Bright House? |
| 13 | A. Under the residence phone number. |
| 14 | Q. So is that a handwritten number, or is that a |
| 15 | typed number? |
| 16 | A. It's typed. |
| 17 | Q. Did Mr. Alvarado type that number? |
| 18 | A. I don't believe so. |
| 19 | Q. So how do you know that Mr. Alvarado gave his |
| 20 | number to Bright House? |
| 21 | A. Because the person at Bright House that filled |
| 22 | this in had to get the number from someone. |
| 23 | Q. So you're assuming that it came from |
| 24 | Mr. Alvarado? |
| 25 | A. It's the number that was given that was |

**54**

1 associated with his account.
2    Q. Were you there when Mr. Alvarado gave his
3 number to Bright House?
4    A. No.
5    Q. Is there any indication on this work order that
6 Mr. Alvarado gave his number to Bright House?
7    A. Yes, that it's listed under the residence phone
8 number.
9    Q. And that's the number that CPA called
10 Mr. Alvarado at?
11    A. I don't remember.
12    Q. Do you get work orders for every account that
13 you call?
14    A. No.
15    Q. What types of accounts do you get work orders
16 for?
17    A. Usually when we have some kind of complaint or
18 lawsuit.
19    Q. And did you have this work order prior to the
20 lawsuit in this case?
21    A. I don't know.
22       MR. GIARDINA: If you'll just give me a
23 minute, Ms. Evans, I think we're getting ready to wrap
24 up here. I just want to review my notes.
25    Q. If you could refer to Plaintiff's Exhibit 6,

**55**

1 please. That's the complaint filed in this complaint --
2 in this case. Specifically Exhibit B, it's all the way
3 in the back. Do you recognize Exhibit B attached to
4 No. 6?
5    A. No.
6    Q. Do you see the signature on Exhibit B?
7    A. Yes.
8    Q. And whose signature is that?
9    A. Our mailroom person.
10    Q. What is that name? It looks -- I don't want to
11 butcher it. It looks like Alfredo Mora --
12    A. That's close enough.
13    Q. -- is that right?
14    A. I think so.
15    Q. What is his name?
16    A. Alfredo something. I know it begins with an
17 "M."
18    Q. Do you know what his last name is?
19    A. I know it starts with an "M."
20    Q. And he's an employee of CPA?
21    A. Correct.
22    Q. What's his job title?
23    A. Mailroom.
24    Q. Is this the mailroom at your main office, or is
25 this a satellite office?

**56**

1    A. At our main office.
2    Q. What date did CPA receive this letter?
3    A. I don't know.
4    Q. Is there any reason to believe that the Postal
5 Service's records would be inaccurate?
6    A. Not that I'm aware of.
7    Q. Is there any reason to believe that Mr. Mora
8 didn't sign for this letter on September 27th?
9    A. Not that I'm aware of.
10    Q. You had stated previously that CPA has a policy
11 regarding receipt of letters from attorneys, right?
12    A. Yes.
13    Q. Now, in this case, how is that policy enforced?
14    A. The policy doesn't pertain to this position.
15    Q. What do you mean?
16    A. I mean --
17    Q. What do you mean by "this position"?
18    A. The mailroom. The mailroom doesn't code
19 anything into any systems.
20    Q. Sure. So Alfredo Mora signed for it, and then
21 did he open the envelope?
22    A. He may have opened it.
23    Q. And then what does your procedure provide for
24 him to do after he opens an envelope?
25    A. To go to our Dispute Resolution Department.

**57**

1    Q. And did he in this case go to the Dispute
2 Resolution Department?
3    A. He would have followed that procedure, yes.
4    Q. And is that a written procedure?
5    A. I'm not sure.
6    Q. And are there notes -- are there any notes in
7 the file indicating that Mr. Mora went to the Dispute
8 Resolution Department?
9    A. I -- I don't know.
10    Q. Do you need a minute to look at the notes and
11 see?
12    A. I can look. I do not see anything. Typically
13 he's not going to put a note in.
14    Q. Who works in the -- how many people are in the
15 Dispute Resolution Department?
16    A. Five or six.
17    Q. Are there any notes made by anybody from the
18 Dispute Resolution Department?
19    A. On this account?
20    Q. Oh, sure, only on this account.
21    A. Yes.
22    Q. Can you point me in that direction? You're
23 on Exhibit No. -- what exhibit are you on? No. 4,
24 right?
25    A. Yes.

```
                                                58
 1     Q. And what page of Exhibit 4?
 2     A. 4.
 3     Q. Can you identify who made those notes that
 4  you're referring to?
 5     A. User CR33.
 6     Q. And do you know who User CR33 is?
 7     A. No.
 8     Q. What was the date that those notes were made?
 9     A. October 9th, 2013.
10     Q. And your procedure was followed in that case?
11     A. Yes.
12     Q. What happened between September 27th and
13  October 9th? Why did it take so long between receiving
14  the letter and entering the notes?
15     A. I don't know.
16         MR. GASET: Objection as to form.
17     Q. Does it normally take that long?
18     A. No.
19     Q. How many times between receiving the letter and
20  entering these notes by User CR33, how many times did
21  CPA contact Mr. Alvarado?
22     A. Can I write on your exhibits?
23     Q. Please feel free, but it's going to be just for
24  your notes. I'm not sure if -- I'm not sure if I'll see
25  it from here with the camera --
```

```
                                                59
 1     A. It's just a tick mark. It's just going to be a
 2  tick mark.
 3     Q. Go ahead.
 4     A. Which exhibit says -- shows the receipt of the
 5  letter?
 6     Q. I think that is Exhibit 6, and that's sort of
 7  the second to last page or the third from last page of
 8  Exhibit 6.
 9     A. Five.
10     Q. Five. So CPA contacted Mr. Alvarado five times
11  after receiving the letter?
12     A. It appears so.
13     Q. How many of those were made by phone, and how
14  many were made by letter?
15     A. Oh, I didn't look at letters.
16     Q. So we have five calls then after the letter
17  anyway?
18     A. Correct, five total.
19     Q. So five calls and no letters?
20     A. Correct.
21     Q. You stated previously that CPA had a policy to
22  immediately cease and desist upon receipt of a letter.
23  Did CPA follow their --
24         MR. GASET: Objection as to form.
25     Q. Did CPA --
```

```
                                                60
 1         MR. GIARDINA: Okay.
 2     Q. Did CPA follow their procedure regarding cease
 3  and desist in this case?
 4     A. I can't answer that.
 5     Q. Why not?
 6     A. Because I don't know.
 7     Q. So you don't know if CPA followed its
 8  procedures in this case?
 9     A. No.
10     Q. Do you know who would know if CPA followed its
11  procedures in this case?
12     A. Well, obviously our procedures were followed.
13  It's the timing.
14     Q. Do your procedures provide for timing?
15     A. Yes.
16     Q. What is the time frame in which your procedures
17  require you to cease and desist?
18     A. Well, as soon as the letter comes in and it can
19  be processed.
20     Q. And how much time do you normally give for
21  processing?
22     A. 24 to 48 hours.
23     Q. Was the 24- to 48-hour policy followed in this
24  case?
25     A. If we can locate the account, then it's 24 to
```

```
                                                61
 1  48 hours.
 2     Q. And did you have trouble locating this account?
 3     A. That's my understanding.
 4     Q. How many people with the last name Alvarado
 5  does CPA have in its database?
 6     A. Several.
 7     Q. How many people named Benjamin Alvarado --
 8     A. Several.
 9     Q. -- does -- how many people named Benjamin
10  Alvarado in Tampa, Florida does CPA have in its
11  database?
12     A. I don't know.
13     Q. Who is in charge of enforcing this policy at
14  CPA?
15     A. Explain "enforcing."
16     Q. Well, you said that CPA has procedures in place
17  for handling letters received from attorneys, right?
18     A. Right.
19     Q. And is there anyone in charge of those
20  procedures?
21     A. Yes.
22     Q. Who's in charge of those procedures?
23     A. The person that the Dispute Resolution
24  Department reports to.
25     Q. So who does the Dispute Resolution Department
```

16 (Pages 58 to 61)

## Page 62

1  report to?
2  A. I'm not sure at this time frame.
3  Q. So the Dispute Resolution Department could
4  report to several different people?
5  A. No.
6  Q. What's the job title of the person who the
7  Dispute Resolution Department reports to?
8  A. It has changed over time.
9  Q. And what is the present job title?
10  A. I'm not sure.
11  Q. What is the name of the person that occupies
12  that job title?
13  A. Deanna Choe.
14  Q. How do you spell that?
15  A. I think it's C-H-O-E.
16  Q. So Deanna Choe is responsible for enforcing the
17  procedure regarding letters received from attorneys?
18  A. At this time.
19  Q. And was Deanna Choe in charge of that on
20  September 27, 2013?
21  A. I do not believe so.
22  Q. Do you know who was in charge of it on
23  September 27, 2013?
24  A. I'm not sure.
25  Q. Would Deanna Choe know who was responsible for

## Page 63

1  it on December 27th, 2013?
2  A. I can find it out. Deanna can find it out. I
3  don't know it off the top of my head.
4  Q. Would you be able to provide that -- would you
5  be willing to provide that information to me through
6  your attorneys after the deposition?
7  A. If need be.
8  Q. You said previously that the procedure for a
9  cease and desist involves locating an account. What do
10  you mean by locating an account?
11  A. It has to be found in our Etech system.
12  Q. How many accounts are in your Etech system?
13  A. Over a million, probably closer to 5 million.
14  Q. And what is the procedure for finding an
15  account in the Etech system?
16  A. It would be to look it up by CPA reference
17  number, look it up by phone number, look it up by
18  whatever information the consumer provided us.
19  Q. Can you look it up by name?
20  A. Yes.
21  Q. Can you look it up by address?
22  A. I'm not sure.
23  Q. Can you look it up by phone number, you said?
24  A. Yes.
25  Q. Can you look it up by birth date?

## Page 64

1  A. No.
2  Q. What about Social?
3  A. Last four.
4  Q. I think we're pretty close to done. I'm just
5  going to review my notes to make sure I didn't miss
6  anything. Unless there's anything you want to add?
7  A. No.
8  Q. CSR, who was Mr. Alvarado's CSR? Mr. Alvarado
9  was there a CSR assigned to this account?
10  A. We don't -- we don't assign accounts.
11  Q. So can you tell me what CSR has worked
12  Mr. Alvarado's account?
13  A. No one.
14  Q. There wasn't a CSR assigned to this account?
15  A. No.
16  Q. Was there a manager assigned to this account?
17  A. No.
18  Q. We described -- we talked about the title of
19  page 7 of Exhibit 4, but we didn't describe the
20  contents. Could you describe what that report is
21  talking about, page 7 of Exhibit 4?
22  A. I'm not real familiar with this form.
23  Q. Okay. Did CPA send a text message to
24  Mr. Alvarado?
25  A. Yes.

## Page 65

1  Q. And was that text message on 2/6/13?
2  A. It appears so.
3  Q. And is the language of that text message as it
4  appears on page 7 of the document marked as Plaintiff's
5  Exhibit 4?
6  A. Yes.
7      MR. GASET: I'm going to object as to text
8  messages. Same as my objection earlier as to the
9  letters, the only thing alleged in the complaint is
10  phone calls.
11      MR. GIARDINA: So objection to relevance?
12      MR. GASET: Relevance.
13      MR. GIARDINA: I have no more questions.
14  However, my cocounsel may wish to -- may wish to feel
15  free to add anything she wants.
16      EXAMINATION
17  BY MS. WOCHHOLZ:
18  Q. Ms. Evans, going back to the procedures for
19  handling letters from attorneys, if you are only given
20  the account holder or the debtor's name, what procedures
21  do you have in place at that point to find the account
22  assuming you have more than one debtor with that name?
23  A. None.
24      MS. WOCHHOLZ: That's all.
25      MR. GIARDINA: Ms. Evans, thank you so much

##### 66

1  for your time today. Sorry to drag you out.
2       THE WITNESS: No problem.
3       THE REPORTER: Can y'all tell me your
4  orders on the record? Would you like the transcript
5  transcribed?
6       MR. GIARDINA: Yes, please. Yeah, we'd
7  like to order the transcript.
8       THE REPORTER: Do you want a paper copy or
9  an electronic version?
10      MR. GIARDINA: Well, I want the cheapest
11 version you've got.
12      THE REPORTER: What about you, Mr. Gaset?
13      MR. GASET: I don't think we'll be ordering
14 now, but can I get back to you?
15      THE REPORTER: Sure. Do you want me to
16 send you the original for her signature?
17      MR. GASET: I think we'll waive that.
18      THE REPORTER: Okay. Thank you.
19      (Off the record at 1:45 p m.)
20
21
22
23
24
25

##### 67

1  STATE OF TEXAS   )
2       I, Lindsy R. Conrad, Certified Shorthand Reporter
3  in and for the State of Texas, hereby certify to the
4  following:
5       That the witness was duly sworn and that the
6  deposition accurately records the witness's testimony;
7       That the amount of time used by each party at the
8  deposition is as follows:
9       Mr. James S. Giardina - 01:38
10      Ms. Kimberly Wochholz - 00:01
11      I further certify that I am neither counsel for,
12 related to, nor employed by any of the parties or
13 attorneys in the action in which this proceeding was
14 taken, and further that I have no interest in its
15 outcome.
16      Certified to by me this 27th day of October, 2014.
17
18
19           _____
             Lindsy R. Conrad, TX CSR 8472
20
21
22
23
24
25